UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| JOSE HERRERA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL NO. 2:13cv418 |
| | ) |
| BP PRODUCTS NORTH AMERICA, INC., | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant, BP Products North America, Inc., ("BP"), on May 18, 2015. The plaintiff, Jose Herrera ("Herrera"), filed his response on September 10, 2015, to which BP replied on September 28, 2015. Also before the court is a motion for hearing, filed by BP on May 18, 2015.

Additionally, BP filed a motion to strike on September 28, 2015. Herrera responded to the motion to strike on October 5, 2105, to which BP replied on October 9, 2015.

As the other dispositive motions in this procedurally convoluted case have finally been briefed out and ruled upon, the court will now turn its attention to these last two pending motions.

Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute between the parties precludes summary judgment, however, since "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law" warrant a trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

## Discussion

On October 17, 2011, Herrera fell at the BP Refinery in Whiting, Indiana. Herrera alleges his fall was caused by BP's failure to provide a safe and adequate walkway.

BP's Whiting Refinery spans 1,400 acres. Herrera's accident occurred in the "outside battery limits" (OSBL") section of the Refinery. The OSBL section had two tents designated "ABF North" and "ABF South". At the time of the accident, Herrera's employer, The American Group ("TAG"), occupied and worked from the ABF South tent. Numerous other contractors occupied and worked from the ABF North tent.

Herrera's accident occurred at approximately 6:15[1] in the evening of October 17, 2011. Herrera left the northeast entrance/exit of the ABF South tent to attend a meeting in the adjacent ABF North tent. While exiting, Herrera tripped on a steel flange or base that was designed to hold an orange plastic lane divider. According to BP, the lane dividers were installed earlier that same day to separate the tent entrance from the exit to minimize accidents caused by persons going different directions simultaneously through the same door. The steel bases were roughly

---

[1] Herrera, in his brief, states that the accident occurred at 6:05 pm.

six inches in diameter and three inches high, and were secured to the ground in a "four-bolt" pattern. The orange dividers were approximately two or three inches in diameter and three feet tall. The bases and dividers were installed by either Superior Construction or Fluor, two other contractors working at the Refinery.

Herrera tripped on a steel base that did not contain an orange lane divider. BP claims, however, that no more than 30 minutes before the accident an orange lane divider was, in fact, installed in the steel base. According to BP, TAG Night Shift Safety Supervisor Timothy Price saw the orange lane dividers in the bases at 5:45 pm. By 6:15 pm, an unidentified contractor had removed the orange lane divider. BP concludes that an unidentified person removed the orange lane divider at some point between 5:45 and 6:15 pm. BP states that before the accident, it was unaware of other incidents of contractors removing orange lane dividers from the steel bases.

Under Indiana law, a landowner, like BP, owes an invitee, like Herrera, a duty to exercise reasonable care for his protection while he is on the landowner's premises. *Burrell v. Meads*, 569 N.E.2d 637, 642-44 (Ind. 1991). However, BP is not the insurer or Herrera's saafety, and before liability may be imposed on BP, it must have actual or constructive knowledge of the danger. *Schulz v. Kroger Co.*, 963 N.E.2d 1141, 1144 (Ind. App. 2012). If BP did not have actual or constructive knowledge of the danger, it has not breached its duty of care to Herrera. *Carmichael v. Kroger Co.*, 654 N.E.2d 1188, 1191 (Ind. App. 1995).

BP characterizes the dangerous condition as the missing orange divider and argues that it did not have actual nor constructive notice of the dangerous condition. As the orange divider had allegedly only been removed minutes before Herrera's accident, BP contends it did not have actual knowledge. BP also asserts that Herrera cannot show that it had constructive knowledge

3

of the dangerous condition. A defendant has constructive knowledge of a dangerous condition when the condition "has existed for such a length of time and under such circumstances that it would have been discovered in time to have prevented injury" if the defendant had used ordinary care. *Schulz, supra,* 963 N.E.2d at 1144. BP argues that, even construing, the facts in the light most favorable to Herrera, the dangerous condition existed for 30 minutes prior to the accident.

In *Schulz*, the plaintiff slipped on water in the defendant's grocery store. 963 N.E.2d at 1144. The evidence indicated that, at most, the dangerous condition was present for ten minutes. *Id*. at 1145. The court determined that ten minutes was insufficient to establish the defendant's constructive notice, as doing so would be tantamount to "imposing a strict liability standard or mandating an employee's presence in every aisle at all times". *Id.*

BP acknowledges that 30 minutes is longer than ten minutes, but points out that the sprawling BP Refinery is larger than a grocery store. BP argues that Indiana law appreciates the distinction, as *Schulz* requires an examination of the surrounding circumstances when addressing a defendant's potential constructive notice. 963 N.E.2d at 1144. BP asserts that retail stores have greater amounts of customer traffic and much higher rates of persons per square foot and, thus, constructive notice in a grocery store is more easily established than constructive notice on a large industrial site. BP argues that imposing constructive notice on BP on these facts would impose a strict liability standard or mandate an excessive BP presence throughout the Refinery, a position that *Schulz* warned against. *Id*. at 1145.

BP also notes that even in retail store settings other jurisdictions have determined that 30 minutes is insufficient to establish constructive notice. In *Randall v. K-Mart Corp.*, the court concluded that the potential that birdseed (the hazard) was present on the defendant's floor for up

4

to 30 minutes did not establish constructive notice. 150 F.3d 210, 212-13 (2d Cir. 1998) (applying Vermont law). Similarly in *Millers of Jackson, Medowbrook Road, Inc. F. Newell*, the court refused to find constructive notice when a toy, which caused the plaintiff's fall, was present on the defendant's floor for half an hour before the accident. 341 So.2d 101, 102 (Miss. 1976). And in *Mergendahl v. C.J. Gayfer & Co., Inc.*, two hours was deemed insufficient to establish constructive notice in similar circumstances. 659 F. Supp. 351, 352-53 (S.D. Miss. 1987).

BP concludes that Herrera cannot establish that BP had constructive notice of the dangerous condition and, thus, Herrera cannot establish that BP breached the duty of care owed to Herrera.

Herrera primarily relies on *Jackman v. Arcelormittal USA LLC*, 2015 U.S. Dist. LEXIS 22422 (N.D. Ind. 2015), which, as BP points out, is readily distinguishable. In *Jackman*, the plaintiff claimed he slipped on a stair because the paint on the stairs did not contain "grip material" that would have created traction. *Id.* at *2-3. The evidence showed that the stairs were repainted with the allegedly inadequate paint in February 2010, three months before the plaintiff fell on May 10, 2010. *Id.* at * 2-3. Since the defendant had three months to discover the slippery step, the court found there was an issue of material fact whether the defendant was on constructive notice of the step's dangerous condition. *Id.* at *11-14. Clearly, the present case is distinguishable, as the tripping hazard *(i.e.* the base with its lane divider removed) existed at most 30 minutes, far less than the three months the defendant in *Jackman* had to identify the dangerous step. *Jackman* therefore offers no support to Herrera's argument that BP was on constructive notice of the trip hazard posed by the lane divider base.

The rest of the cases Herrera cites are similarly unavailing. *Barsz v. Max Shapiro, Inc.*,

600 N.E.2d 151 (Ind. Ct. App. 1992), addressed the issue of whether the defendant restaurant owner was on constructive notice of water on the floor that caused the plaintiff to slip. *Id*. at 153. However, in *Barsz* the restaurant's general manager testified that he knew customers would spill their food and drinks on their way from the serving line to their seats, and admitted that these spills were "commonplace." *Id*. In the present case there is no evidence that the removal of the lane dividers was commonplace before the accident such that BP should have known of the practice. Indeed, the lane dividers were installed for the first time only a few hours before the accident, thus there was no basis for BP to appreciate that they would be removed by an unknown person, creating a tripping hazard. (Bergstrom Dep., 1 58: 16 – 59: 9.)

The last case Herrera cites, *Peterson v. Wal-Mart Stores, Inc.*, 241 F.3d 603 (7th Cir. 2000), is also distinguishable. *Peterson* applied Illinois, not Indiana, law, making it irrelevant to the Court's analysis. *Id*. at 604. It is also factually distinguishable. In *Peterson,* there was evidence that the defendant's "employees patrol[led] the aisles constantly for signs of spills." *Id*. at 605. Under that level of scrutiny, the court accordingly held there was a material issue of fact as to whether the employees should have seen the spilled lotion that caused the plaintiff to slip and fall. *Id*. There is no such evidence in this case of constant BP surveillance of the area where Herrera fell. In fact, there is no evidence that any BP employees walked by the northeast entrance of TAG's tent during the maximum of a 30-minute period of time that the lane dividers were removed from their bases. Moreover, the court cannot ignore the difference in size between a typical Wal-Mart, a building with a relatively small footprint with greater amounts of customer traffic compared to a massive oil refinery like BP's Whiting Refinery. *Peterson* consequently offers no support for Herrera's interpretation of Indiana law.

With respect to the facts, BP argues that Herrera has failed to cite any evidence creating an issue of material fact that BP knew or should have known of the alleged trip hazard. BP also claims that Herrera's recitation of the facts misrepresents several witnesses' testimony. These misrepresentations are the subject of a motion to strike. The court will evaluate the arguments pertaining to the motion to strike in conjunction with the motion for summary judgment.

BP claims that Herrera's most glaring misrepresentation is that the lane dividers posed a safety risk when first installed the late morning of the date of the accident. BP points out that there is no such evidence. TAG's day-shift Field Safety Representative, Travis Bergstrom, did testify that the day-shift workers complained about the lane dividers when they were first installed that day. (Bergstrom Dep, 31: 18 – 33: 3.) However, the issue the workers had with the lane dividers was not that they were unsafe, but that they would slow the flow of workers to and from the tents at break time, cutting into their break. (Bergstrom Dep., 31: 18 – 33: 3.) Moreover, contrary to Herrera's claim in his brief, TAG's night-shift Field Safety Representative, Tim Price, testified that he heard no complaints to him or BP about the lane dividers as fully installed. (Price Dep., 52: 6-18.) Even if the TAG employees had raised a safety issue with the lane dividers when fully installed, Herrera has failed to point to any evidence suggesting anyone from TAG ever complained about the issue in the presence of any BP employees. Such evidence showing that BP knew or should have known of the dangerous condition is necessary to show breach of duty under Indiana premises law. *Schmidt*, 963 N.E.2d at 1144.

Since the lane dividers were not dangerous when fully installed in their bases, the crucial issue is the time period that the lane dividers were not fully installed at the northeast entrance of TAG's ABF South tent where Herrera fell. There is no material issue of fact that this time period

was 30 minutes or less. Herrera claims that TAG's night-shift Field Safety Representative, Tim Price, testified that when he entered the northeast entrance some of the lane dividers were not in their bases. In actuality, Price testified with certainty in his deposition that all three lane dividers were present when he entered the northeast entrance to TAG's ABF South tent at 5:45 pm and no other witness has testified to the contrary. Herrera allegedly fell at around 6:05 or 6:15 pm on October 17, 2011. This means that at most only 30 minutes, and perhaps as little as 20 minutes, passed at which time the lane dividers at the northeast entrance where Herrera fell were not fully installed in their bases, creating the alleged tripping hazard. Given the sheer size of BP's 1400-acre oil refinery, even if the lane dividers had been removed for an hour, this would not be sufficient to show the dangerous condition "existed for such a length of time and under such circumstances that it would have been discovered in time to have prevented injury . . . ." *Schulz*, 963 N.E.2d at 1144.

Only one witness testified that he saw lane dividers missing from the bases before the accident: TAG laborer Ronald Smith. While Herrera is quick to point this out, he fails to mention that Ron Smith entered the TAG ABF South tent at a different door than Herrera, and thus does not have personal knowledge whether any lane dividers were missing at the northeast entrance before Herrera tripped. (Smith Dep., 28: 10-17; 32: 2-14.) Even then, Smith only saw missing lane dividers at the southwest entrance to the TAG ABF South tent when he walked in with coworker Robert Cunningham 30-45 minutes before the accident. (Smith Dep., 45: 24 – 46: 8.) There is no evidence any BP employees walked by that entrance during that short time period such that BP would have had notice of the potential trip hazard. Herrera's next misrepresentation is that BP employees were in and around TAG's South ABF tent in the moments before the

8

accident. There is no evidence supporting this claim. In fact, Tim Price testified that the only BP employees in the area of the tents were Roger Croft and Gino Martinez, and they did not enter TAG's South ABF tent before the accident. (Price Dep., 63: 19-23.) Price further testified that Croft and Martinez only entered the ABF North tent before the accident, and would have entered the north tent at entrances on its north side. (Price Dep., 63: 1-6; 66: 3-12.) Price testified that given the layout of the north and south tents, Croft and Martinez therefore would not have had an opportunity to view the northeast entrance of TAG's ABF South tent before the accident. (Price Dep., 67: 7-14.) A drawing that Price drew of the tents' configuration further demonstrates that the BP employees would not have had an opportunity to observe the northeast entrance. ( Ex. 9 to Price Dep., Price authenticated the drawing at Price Dep., 120: 20 – 121:6.)

In his deposition, Herrera claimed that he was told that a BP employee was following him out of the ABF South tent when he fell, but the only basis for this testimony was that an unidentified nurse[2] told him this after they heard an announcement over a radio. (Herrera Dep., Vol. 1, 73: 6-25.) Herrera admitted he had no personal knowledge whether this was true (Herrera, 73: 6-25), and Herrera never deposed anyone able to verify this claim. Such testimony lacks any foundation and is hearsay, is consequently inadmissible, and cannot be considered by the Court on summary judgment. *Sow v. Fortville Police Dep't*, 636 F.3d 293, 301 (7th Cir. 2011) ("a court may consider only admissible evidence in assessing a motion for summary judgment."). Although Herrera generally testified that BP kept a presence at the construction areas to ensure

---

[2] In his response to the motion to strike, Herrera argues that the statement is admissible as the admission of a party opponent. However, as Herrera has not presented any evidence that any of the hearsay declarants were BP employees, it is clear that the statement does not meet the exception to the hearsay rule.

work proceeded safely (Herrera Dep., 28: 2-25), he never testified that he personally saw any BP personnel in or around the areas that did not have ongoing construction, such as TAG's tent, on the date of the accident before the accident occurred.

Clearly, there is no evidence Croft or any other BP employees walked by the northeast entrance of the South ABF tent (or any other entrances to the tent) at a point in time when lane dividers were missing such that they could have witnessed a tripping hazard. For this reason, Herrera cannot show that BP knew or should have known of the alleged tripping hazard posed by the missing lane dividers.

Herrera has also argued that the lighting outside the northeast entrance of TAG's ABF South tent was poor, which Herrera claims is evidence that BP breached its duty of care. BP, however, counters that the purported lack of adequate lighting is irrelevant because Herrera never testified that he tripped because he could not see the flange due to poor lighting. Rather, Herrera testified that he exited the northeast entrance of TAG's tent directly behind and in front of a mass of people who were also exiting. (Herrera Dep., 45: 17-23.) Herrera admits that as he exited the tent, he was looking "straight ahead of me to go to the next tent on the left." (Herrera Dep., 60:14-21.) Since Herrera was looking straight ahead when he exited the tent, and was sandwiched between other workers, BP argues that even if the lighting had been perfect Herrera would not have seen the object on which he allegedly tripped. This court agrees that the testimony about the lighting is irrelevant and inadmissible. *Sow*, 636 F.3d at 301.

This court finds that Herrera has failed to show that there is a material issue of fact that BP knew or should have known of a dangerous condition at the northeast entrance of TAG's ABF South tent. It follows that Herrera cannot demonstrate that BP breached a duty of care.

Accordingly, summary judgment is appropriate in favor of BP.  Further, as BP has conclusively shown that certain evidence presented by Herrera is inadmissible, as discussed above, BP's motion to strike will also be granted.

## Conclusion

On the basis of the foregoing, BP's motion for summary judgment [DE 43] is hereby GRANTED.  Further, BP's motion to strike [DE 59] is also hereby GRANTED.   As the court was able to decide the issues on the basis of the well-written briefs, BP's motion for hearing [DE 45] is hereby DENIED.

Entered: March 28, 2016.

                                                s/ William C. Lee  
                                                William C. Lee, Judge  
                                                United States District Court